**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

FISHER ISLAND COMMUNITY
ASSOCIATION, INC., and FISHER
ISLAND CLUB, INC.,

                  Plaintiffs,

v.

MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,

                  Defendant.

Case No.:

**COMPLAINT**

Plaintiffs Fisher Island Community Association, Inc. and Fisher Island Club, Inc. (together, "Fisher Island"), by and through their undersigned counsel, bring this Complaint against Defendant Miami-Dade County (the "County") and allege as follows:

**NATURE OF THE CASE**

1. For years, Miami-Dade County knew its lease on an aging fuel depot was expiring. The County did nothing. Now, with the deadline upon it, the County seeks the most expedient solution: seize ten acres of private property through eminent domain and operate a dangerous, century-old fuel facility indefinitely—all so private cruise lines need not be inconvenienced while a replacement is built elsewhere.

2. The Takings Clause demands that condemnation serve genuine public necessity and be reasonably necessary. The County's taking fails both requirements. The County dismissed alternatives without study. It proposes perpetuating a dangerous facility to serve private cruise lines. And it excluded Fisher Island from negotiations over Fisher Island's own property rights. The County's years of inaction created the urgency it now invokes—but self-created emergencies

cannot justify constitutional shortcuts.

3.      The facility stores 28.3 million gallons of combustible fuel in tanks over a century old—just 700 feet from family homes and 2,000 feet from an elementary school serving over 160 children. Fisher Island has no road access. Every resident depends on boats or ferries for evacuation. The tanks sit in a hurricane flood zone and violate current fire safety codes.  The County has produced no safety analysis. Not one page examining what it means to perpetuate 28.3 million gallons of fuel next to homes and a school filled with children.

4.      The County dismissed nine alternative sites without conducting feasibility studies or cost-benefit analyses. Its own report identifies viable interim solutions—barging fuel from nearby ports—that would maintain operations without seizing private property or endangering residents. The County refused to consider them. The County chose condemnation first, justification later.  Now the County is in the midst of an after-the-fact "study," presumably to rule out the multitude of alternatives.

5.      The Property's prior owner even offered to invest $200 million to develop a new fuel facility on or adjacent to PortMiami. The Port spans 520 acres—a modern fuel facility would require barely one percent of that footprint. But the County still approved eminent domain.

6.      Even the County's own Commissioners questioned the rushed process. Chairman Rodriguez questioned why the County was "even talking about eminent domain to a private parcel in the most expensive zip code in the country." He acknowledged the property "probably should have condos." Commissioner Cohen Higgins demanded answers: "Why is it that we didn't jump in if it's such an asset, if it's so absolutely necessary to the function of our port? Why are we waiting until a week before the closing to have an emergency meeting with little to no notice to the property owners." Commissioner Regalado faulted the Port's institutional failure: "The Port

should be following all the real estate that happens around a five-mile radius from there. This particular purchase was an open, disclosed, and active purchase. This was not a backroom deal. So we could have participated in the purchase of this fuel facility."

7.      The County's institutional failure created this emergency. For years, PortMiami's business plans never mentioned the expiring lease. The County's own Chief Operating Officer admitted: "We shouldn't be here this late. I don't disagree with you on that point." When pressed about why the County failed to act earlier, he could only acknowledge: "Should we have been here six months ago? Should we have been here six years ago? I mean the truth is we now know that we were the only port that had this exposure."

8.      Fisher Island holds recorded rights to 41.8% of the property. In October 2025, Fisher Island obtained these rights through agreements with the current owner in exchange for supporting the owner's residential development project and providing millions of dollars in club memberships. The agreements give Fisher Island explicit veto power over any sale of their portion of the property, except for in lieu of foreclosure or HRP's failure to obtain developmental permits. Under the recorded Option Agreement, the current owner cannot sell or convey the Fisher Island parcel without Fisher Island's prior written consent.

9.      Yet the County excluded Fisher Island from private mediation proceedings that will determine whether Fisher Island loses their property. The County negotiates with the current owner to transfer property over which Fisher Island holds contractual veto rights—without Fisher Island's involvement or consent. This secret process violates due process.

10.     The proposed condemnation violates the Constitution. The facility serves private cruise lines, not the general public. The County's own documents identify alternatives it refuses to study. The taking is not reasonably necessary—the County maintains a valid lease and has viable

alternatives. And the County deprived Fisher Island of due process by excluding them from proceedings that will determine their property rights.  Each deficiency alone would be fatal. Together, they demonstrate a taking that serves governmental convenience, not constitutional necessity.

11.    Fisher Island seeks declaratory and injunctive relief to enforce the County's constitutional obligations.  The government taking of private property demands rigorous justification, not post-hoc rationalization. The County offers only the latter—a rushed process, no safety analysis, dismissed alternatives, and secret negotiations designed to circumvent property rights. The residents of Fisher Island deserve more.  And the Constitution requires more.

## **PARTIES**

12.    Plaintiff Fisher Island Community Association, Inc., ("FICA") is a Florida not-for-profit corporation that represents over 800 property owners on Fisher Island, Miami-Dade County, Florida.  FICA manages, maintains, and improves Fisher Island's common areas and facilities.

13.    Plaintiff Fisher Island Club, Inc., (the "Club") is a Florida corporation that has served the Fisher Island community for decades, providing recreational and social facilities to its members.

14.    Defendant Miami-Dade County (the "County") is a political subdivision of the State of Florida.

15.    Nonparty HRP Fisher Island, LLC is a Delaware limited liability company. HRP is the current owner of the property located at Parcel Nos. 30-4209-000-0040 and 30-4209-000-0050

(the "Property").  The Property is approximately 10 acres.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Counts II (unconstitutional taking) and IV (due process) arise under federal law.

17.     The Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(a) because they are so related to the claims for which the Court has original jurisdiction that they form part of the same case and controversy under Article III.

18.     The Court has general personal jurisdiction over the County because it is a subdivision of the State of Florida located in this District.

19.     Venue is proper in the Southern District of Florida, Miami Division, under 28 U.S.C. § 1391(b) because the County is located in this District, a substantial part of the events or omissions giving rise to the claims in this action occurred in this District, and the Property is located in this District.

## FACTUAL ALLEGATIONS

### I.     FISHER ISLAND AND THE FUEL BUNKER

20.     Fisher Island is a residential community located off the coast of Miami Beach, accessible only by ferry, boat, or helicopter. The Island has no direct road access—every resident, every schoolchild, every emergency responder depends on water or air transport for entry and exit.

21.     Fisher Island is home to families with children. The community includes a clinic, fire station, elementary and middle school serving over 160 children, veterinary clinic, mail facility, grocery store, playground, and dog park.

22.     The Property consists of approximately ten acres on Fisher Island.  A marine fuel

storage facility (the "Fuel Bunker") sits on the Property.

23.     Since the 1920s, the County has leased the Property through successive leases to store and provide fuel for vessels at PortMiami—now primarily cruise ships.  Over the following century, Fisher Island transformed into a dense residential community with homes, schools, and families. What once was an isolated industrial outpost now sits at the heart of that community. Today, it is fundamentally incompatible with the neighborhood that has grown around it.

24.     The Fuel Bunker stores 28.3 million gallons of petroleum fuel—the equivalent of 42 Olympic-sized swimming pools of combustible material—in aging storage tanks, some over 100 years old.

25.     This massive fuel depot sits just 155 feet from the nearest public space, less than 700 feet from family homes, and 2,000 feet from an elementary and middle school.

26.     The Fuel Bunker is located in FEMA Flood Zone AE and Storm Surge Planning Zone A, the zone facing the greatest storm surge risk from Category 1 and higher hurricanes.

## II.     FISHER ISLAND'S CONTRACTUAL RIGHTS

### A.     HRP's Purchase and Development Plans

27.     In or around May 2024, TransMontaigne Terminals LLC, the prior owner, listed the Property for sale.

28.     HRP purchased the Property with plans to develop luxury residential condominiums after removal of the Fuel Bunker.

### B.     The Development Agreement

29.     On or about October 8, 2025, FICA, the Club, and HRP entered into a Development

Agreement regarding HRP's planned condominium development on the Property.[1]

30. Under the Development Agreement, HRP agreed to convey four acres of contiguous land within the Property to FICA (the "FICA Parcel"). This conveyance was essential to the transaction. Fisher Island is not merely a collection of buildings—it is an integrated residential community. The value of owning property on Fisher Island derives from membership in that community: access to FICA's common areas, eligibility for Club membership, and participation in the amenities and services that define the Fisher Island lifestyle. The four-acre conveyance was the mechanism that would bring HRP's development into the Fisher Island community and make its units marketable as Fisher Island residences.

31. The FICA Parcel constitutes approximately 40% of the Property and includes land on which the Fuel Bunker currently sits.

32. In consideration for HRP's agreement to convey the FICA Parcel, FICA and the Club agreed to: (1) support HRP's development project; (2) grant HRP and future unit owners Club memberships and use of Fisher Island common areas; and (3) assist HRP with obtaining necessary permits and approvals.

33. As part of the Development Agreement, HRP granted memberships to the Club valued in the millions of dollars.

34. Once HRP's condominiums are constructed, HRP must purchase additional Club memberships for future unit owners, a transaction worth nearly $20 million depending on the number of units.

35. Each Club member would also be required to pay annual membership dues to the

---

[1] The Development Agreement contains a confidentiality clause prohibiting Fisher Island from publishing it publicly.

Club.

### C.   The Option Agreement

36.   On or about October 8, 2025, FICA and HRP executed an Option Agreement memorializing FICA's rights with respect to the FICA Parcel. A true and correct copy of the Option Agreement is attached as **Exhibit A**.

37.   Under Section 1 of the Option Agreement, FICA obtained the right to receive the FICA Parcel upon HRP's completion of certain preconstruction activities.

38.   Under Section 2 of the Option Agreement, FICA obtained veto power over any sale or conveyance of the FICA Parcel, subject only to limited exceptions.

39.   Section 2 of the Option Agreement provides in full:

> Restriction. Optionor agrees that, except as set forth in Section 3 below, the FICA Parcel cannot be sold or conveyed to any party except Optionee without the prior written consent of Optionee (other than pursuant to foreclosure, deed in lieu of foreclosure or assignment in lieu of foreclosure to any bona fide Lender (as hereinafter defined)) (the "Restriction").

40.   Under the Option Agreement, HRP is the "Optionor" and FICA is the "Optionee."

41.   Section 3 of the Option Agreement—the only other exception to FICA's veto power—applies only "[i]n the event that Optionor does not obtain the Development Approvals," referring to governmental approvals necessary for construction of the condominium project.

42.   Under Section 6 of the Development Agreement, FICA has the power to veto renewals of the County's lease for terms longer than 24 months for a period of six years, should HRP be unable to obtain Development Approvals in good faith.

43.   Under Section 8 of the Option Agreement, FICA has the right to receive 41.8% of any land remaining from the Property in the event of a partial taking by eminent domain.

44.   A memorandum of agreement reflecting the terms of the Option Agreement—

including the Restriction—was duly recorded.

45. When FICA and the Club negotiated and entered into these agreements with HRP, they relied on the County's acquiescence that the Fuel Bunker would be removed at the end of its lease in 2027.

46. According to public statements from Jimmy Morales, Miami-Dade County's Chief Operating Officer, the County made an offer to purchase the Property from TransMontaigne following its listing in May 2024, but the offer was rejected. The County's response: inaction and silence. Not a threat of eminent domain.

47. Had FICA and the Club known the County intended to perpetuate the dangerous Fuel Bunker indefinitely, they would have immediately challenged the continued operation of century-old fuel storage tanks adjacent to homes and a school.

### III. THE COUNTY'S THREATENED USE OF EMINENT DOMAIN

48. During a September 18, 2025, Special Meeting of the Board of County Commissioners, with the 2027 deadline approaching and changes in entitlements already in place, the County did an about-face. Instead of moving on from the Property, the County has threatened to seize the Property through eminent domain and operate the aging, dangerous facility indefinitely.

49. The County's justification reveals its priorities: cruise line convenience trumps residential safety. The County claims cruise lines would abandon PortMiami—the "Cruise Capital of the World"—if required to use alternative fueling arrangements during construction of a replacement facility. The County accepted at face value the cruise industry's threat to walk away from billions in annual revenue rather than absorb modestly higher fuel costs during a transition period. That threat—and the County's capitulation to it—is the stated reason for this

condemnation.

50.     Despite knowing for years that its lease was coming to an end, the County treated the 2027 deadline as an afterthought.

51.     PortMiami's 33-page business plan for fiscal years 2024 and 2025 never mentions the expiring lease.

52.     The expiring lease appears nowhere in PortMiami's ten "Key Issues," four "Priority Initiatives," or four "Future Outlook" notes.

53.     PortMiami's 2024 Annual Comprehensive Financial Report likewise ignores the lease expiration entirely.

54.     When the County's inaction finally came before the Board of County Commissioners on September 18, 2025, multiple Commissioners condemned the Port's failure to plan ahead. Chairman Anthony Rodriguez criticized the rushed process: "I don't like that it's rushed. . . . I don't like that it's being brought to us in the ninth inning." He questioned why the County was "even talking about eminent domain to a private parcel in the most expensive zip code in the country." He acknowledged the property "probably should have condos. It's just the reality. It probably should have condos." Commissioner Cohen Higgins expressed disbelief at the timing: "Why is it that we didn't jump in if it's such an asset, if it's so absolutely necessary to the function of our port? Why are we waiting until a week before the closing to have an emergency meeting with little to no notice to the property owners." She demanded answers: "You could not have known that this property was for sale for two years and have done essentially: wait until a week or two before the closing to come before the Board and say that it's an emergency." Commissioner Regalado faulted the Port's institutional failure: "The Port should be following all the real estate that happens around a five-mile radius from there." She noted that "this particular purchase was

an open, disclosed, and active purchase. This was not a backroom deal. So we could have participated in the purchase of this fuel facility."

55.     The County scrambled to justify its rush to condemnation. On October 7, 2025—days before HRP's scheduled closing—the County finally produced a written report addressing alternative sites. Years of notice, and the County's analysis arrived 72 hours before closing. Even the County's Chief Operating Officer, Jimmy Morales, admitted at the September 18, 2025, Board meeting: "I'm nothing if not candid. We shouldn't be here this late. I don't disagree with you on that point." When pressed about why the County did not act earlier, Morales could only acknowledge: "Should we have been here six months ago? Should we have been here six years ago? I mean the truth is we now know that we were the only port that had this exposure."

56.     Florida law requires condemning authorities to consider and weigh five mandatory factors: (1) availability of alternative sites, (2) costs, (3) environmental factors, (4) long-range area planning, and (5) safety considerations.

57.     The County's back-of-the-envelope report fails every factor. The County dismissed alternative sites without feasibility studies. It conducted no cost-benefit analysis. It did not study environmental impacts. It engaged in no long-range planning—indeed, its own business plan never mentioned the expiring lease. And most egregiously, it produced not a single page of safety analysis. The record reveals that the County is acting first and thinking later—if at all.

**A.     The County Fails to Seriously Consider Alternatives**

58.     The October 7 report identified nine potential alternatives for fuel storage to serve PortMiami.

59.     The County dismissed each alternative without conducting proper due diligence,

cost-benefit analysis, or feasibility studies. The analysis speaks for itself.

  a.  Construction of fuel storage on port property at Cargo Central? Dismissed in a single sentence: "If the area were to be used, the above-mentioned functions that would be impacted would need to be redeveloped somehow, somewhere."

  b.  Construction of a pipeline system? "Further analysis would need to be done to calculate the cost of capital infrastructure work to construct berthing for a fuel tanker and barges, a fuel storage facility and hydrant pipelines. . . ."

  c.  Acquisition of other waterfront property? "The debt service would need to be compared to the market's ability to pay a higher cost for fuel."

60.  The County's report confirmed what Fisher Island suspected: the County never conducted the analysis necessary to evaluate alternatives. The County chose condemnation first, justification later.  When Commissioner René Garcia asked at the September 18, 2025, Board meeting, "Have we explored any other options?", the answers revealed the County's cursory approach. Chief Operating Officer Jimmy Morales acknowledged the County "looked carefully at other options: rail bringing the fuel, pipelines, barges from Port Everglades," but dismissed each as "extremely expensive, extremely disruptive, just not practical"—without presenting any feasibility studies, cost-benefit analyses, or actual data supporting these conclusions. When pressed about what other ports do, Port representatives could only offer vague responses about "fuel barges" being "dependent on weather" and less reliable, but provided no concrete analysis comparing costs, feasibility, or actual implementation timelines. Commissioner Regalado noted that while the County claimed alternatives were impractical, "I think that we can find other

alternatives, but I don't think that we can find an alternative in two and a half years"—implicitly acknowledging that with proper planning over the years of notice the County had, alternatives could have been developed. The County chose condemnation first, justification later.

61.     Several Commissioners recognized the inadequacy of the County's analysis. Commissioner Garcia repeatedly pressed for information about what other ports do and what alternatives exist, asking: "What do other ports in the United States of America that are comparable in size, what do they do? Do they have a mix? Do they have other ways do they transport fuel in?" When told other ports have "mechanisms of fuel barges," he asked why Miami could not use similar methods. The vague, non-specific responses confirmed the County had not conducted serious comparative analysis. The County's scramble to justify condemnation at the last minute, rather than planning systematically over years, demonstrates the proposed taking is not "reasonably necessary" but rather an emergency of the County's own making.

62.     The County's stated "preferred option"—condemn the Property and maintain the "status quo"—reveals the true priority: convenience above all else.

63.      Remarkably, the County's own report identifies viable temporary solutions. The County could barge fuel from Port Everglades or Freeport as a "fallback position" during construction of a permanent alternative facility. This option would maintain Port operations without seizing private property or perpetuating a dangerous century-old facility next to family homes.

64.     The County has not even determined how much of the Property it needs yet the County proposes to condemn all of it.  It has produced no study, no site plan, and no engineering analysis establishing that fuel storage operations require the entire Property. This wholesale approach reveals the County's true motive: convenience over necessity.  But the Constitution does

13

not permit a taking of more property than reasonably necessary simply because a smaller taking would require more planning.

### B.    The County Ignores the Staggering Financial Cost

65.    The County's rush to condemnation ignores the extraordinary financial burden it would impose on taxpayers.

66.    The County estimates the Property's value at "close to $200 million." But the FICA Parcel alone—about 40% of the Property—exceeds $100 million in value.

67.    These estimates significantly understate the true cost. The Property's market value must reflect its highest and best use—luxury condominium development in the most expensive ZIP code in the United States, complete with Fisher Island amenities and Club memberships.

68.    Florida law also requires the County to pay its own litigation costs and the property owner's reasonable attorneys' fees in eminent domain proceedings. Fla. Stat. § 73.092(1).

69.    Beyond acquisition costs, the County would assume crushing ongoing liabilities: operating and maintaining a century-old facility for decades, environmental cleanup and remediation, and potential catastrophic liability for safety or environmental incidents at an aging facility in a flood zone adjacent to homes and a school.

70.    In addition, were the Property to remain a Fuel Bunker rather than a luxury condo, the County would lose an estimated $12-16 million in annual property taxes.  Upon information and belief, that sum far exceeds the annual cost of barging fuel from Port Everglades.

71.    The continued operation of an industrial fuel storage facility—particularly one storing 28.3 million gallons of combustible material in a hurricane flood zone—will also have a detrimental impact on property values throughout Fisher Island.

72.    The County never compared these staggering costs against the modest expense of

14

barging fuel from Port Everglades during construction of a modern, properly-located alternative facility. The County simply chose the most expensive, most disruptive option—because it perceived it to be the most convenient despite its lack of due diligence.

### C.    The County Ignores Safety Considerations

73.    The County has ignored the most important factor for eminent domain under Florida law: safety. Not a single page of analysis.  Not even cursory consideration of what it means to perpetuate a century-old fuel depot storing 28.3 million gallons of combustible material next to family homes and a school filled with children.

74.    The facility violates current NFPA 30 (National Fire Protection Association) safety requirements for tank spacing.

75.    In South Florida's humid maritime environment, multiple corrosion mechanisms attack aging tanks: atmospheric corrosion, corrosion under insulation, and microbiologically induced corrosion.

76.    Industry standards require regular inspection, surface coating reapplication, and wall thickness monitoring to safely maintain aging fuel storage infrastructure. The County never asked whether these standards are being met.

#### 1.    *Dangerous Proximity*

77.    The Fuel Bunker sits 155 feet from the nearest public space—less than half a football field.

78.    Family homes sit less than 700 feet away—the length of two city blocks.  And additional housing is being constructed approximately 200 feet away.

79.    An elementary and middle school serving over 160 children sits 2,000 feet away.

80.    In the event of fire or major spill, these children face elevated toxic exposure risk.

The County never studied this risk or even considered it.

81. The Fuel Bunker presents multiple pathways to catastrophic fire or explosion:

a. Maintenance activities igniting flammable vapors;

b. Equipment failure from lack of maintenance, causing material degradation and leaks;

c. Routine transfer operations involving hose failures, static electricity discharge, or overfill events;

d. Hurricane damage and flooding, and human error.

82. A fire at the Fuel Bunker would produce toxic smoke containing respirable particulate matter, carbon monoxide, nitrogen oxides, sulfur dioxide, and other substances harmful to human health.

83. Persons with asthma, cardiopulmonary disease, or lung damage face severe health consequences from exposure to fuel constituents or combustion byproducts.

84. Fisher Island residents living 700 feet from the facility could breathe extremely high concentrations of toxic smoke during a fire.

### 2. No Road Access: The Evacuation Nightmare

85. Fisher Island has no road access. Emergency evacuation requires boats or ferry service.

86. This creates a fatal chokepoint. In the event of fire, explosion, or toxic release from 28.3 million gallons of fuel, thousands of residents—including children, elderly persons, and those

with respiratory conditions—must wait for boats while breathing toxic fumes.

### 3. Hurricane Vulnerability: Compounding Every Other Risk

87. The Fuel Bunker sits in FEMA Flood Zone AE, a special flood hazard area.

88. The facility also sits in Storm Surge Planning Zone A, facing the greatest storm surge risk from Category 1 and higher hurricanes.

89. Category 1 hurricanes produce storm surges of 4-5 feet above normal tide levels, directly threatening the integrity of the aging storage tanks and associated infrastructure, including a dilapidated seawall.

90. Hurricane vulnerability compounds every other risk—aging infrastructure, corrosion, proximity to homes, evacuation limitations. A storm creates multiple simultaneous pathways to catastrophic failure.

### 4. Public Health: Toxic Exposure Even Without Fire

91. Even without fire, bulk petroleum storage may create public health risks from chemical exposure. Spilled fuel releases volatilized hydrocarbon fumes causing eye, nose, throat, and lung irritation.

92. High sulfur fuel oil stored at the facility typically releases hydrogen sulfide gas, a toxic substance that proves fatal at high concentrations.

### 5. The County Conducted Zero Safety Analysis

93. Despite these potential risks and Florida law's mandatory requirement to consider safety—the County conducted no safety analysis. The County commissioned no studies.[2]

94. The combination of 28.3 million gallons of combustible fuel near dense residential

---

[2] The 139-minute transcript of the September 18, 2025 Special Board Meeting contains zero discussion of: (1) the safety risks of 28.3 million gallons of petroleum fuel; (2) proximity to residential homes (700 feet) or the elementary school (2,000 feet); (3) hurricane and flood zone

population, aging non-compliant infrastructure, hurricane and flood vulnerability, and boat-only evacuation creates an unacceptable risk to public safety.

95.     On November 14, 2025, FICA sent a letter to the County and HRP outlining (a) FICA's rights, (b) FICA's opposition to the continued operation of a fuel bunker on Fisher Island due to safety concerns, and (c) the fatal defects in the County's plan for eminent domain.  The County never responded.

96.     Instead, on information and belief, the County is now preparing a more detailed "study"—not to inform its decision, but to provide post-hoc cover for its October 9, 2025, approval of eminent domain.

### IV.     THE COUNTY APPROVES EMINENT DOMAIN AND SEEKS TO NEGOTIATE AWAY FISHER ISLAND'S RIGHTS IN SECRET

97.     During a second Board of County Commissioners meeting on October 9, 2025, the Board approved a resolution (Resolution No. R-995-25) that (1) granted the County permission to "acquire said property by purchase or eminent domain proceedings" based on its flimsy October 7 report and (2) enter private mediation with HRP to negotiate acquisition of the Property.[3]

98.     Before initiating eminent domain, 60 days from October 20 must have elapsed or the mediator must have declared an impasse.  Given that the 60 days have since elapsed, the County may initiate eminent domain at any moment.

99.     Fisher Island was excluded from the private mediation, which, upon information and belief, is ongoing.  This exclusion is indefensible. The mediation involves the FICA Parcel,

---

vulnerabilities; (4) aging tank infrastructure or NFPA violations; (5) evacuation challenges from boat-only access; (6) toxic exposure risks; or (7) any safety considerations whatsoever. County officials discussed only economic convenience and cruise line operations.

[3]      Miami-Dade    Cnty.,    Fla.,    Res.    No.    R-995-25    (Oct.    9,    2025), https://www.miamidade.gov/govaction/legistarfiles/MinMatters/Y2025/252062min.pdf.

property over which FICA holds explicit veto rights under Section 2 of the Option Agreement. FICA also holds a 41.8% interest in any remaining property after partial condemnation under Section 8.

100. The mediation may determine whether the Club receives the nearly $20 million in membership purchases it bargained for under the Development Agreement.

101. The mediation decides whether Fisher Island families will finally see removal of a dangerous century-old fuel depot from their residential community—or face its perpetuation indefinitely, mere hundreds of feet from their homes and their children's school.

102. Yet FICA and the Club sit on the sidelines while the County and HRP negotiate away their contractual rights, their financial interests, and their community's safety.

103. The County has not consulted FICA or the Club. Neither has HRP sought FICA's written consent as required by the Option Agreement for any sale or conveyance of the FICA Parcel. The message is clear: FICA, the Club, and the people of Fisher Island have no say in the matter.

104. Even some of the County Commissioners themselves recognized the procedural defects with excluding affected parties. Commissioner Garcia stated: "We haven't had one ounce of public testimony. . . . We're talking about investing enterprise fund dollars, which are our dollars. And we haven't had a conversation about cost sharing. We haven't had a conversation of what our residents think. We have to be very careful when we proceed in this manner. This is not good governance." Commissioner Cohen Higgins expressed similar concerns: "I am extremely uncomfortable with the procedural posture that this is being presented to us. . . . We call special meetings all the time for far less serious matters. . . . Considering the import of this item place an item. . . on an agenda and notice it. . . . Show up and take a vote and allow the interested parties

to come and give testimony including members of the public that may have an interest in this issue." The County's own Commissioners recognized that proceeding without notice to and participation by affected parties violated basic principles of good governance—yet the County proceeded anyway.

## V.    ACTUAL CONTROVERSY REQUIRING DECLARATORY RELIEF

105.    The County's threat to condemn the Property creates an actual and imminent controversy between the parties.

106.    FICA does not consent—and will never consent—to any sale or conveyance of the FICA Parcel to the County for it to serve as a fuel bunker.

107.    FICA has a direct financial interest in the scope of any eminent domain taking. Under Section 8 of the Option Agreement, FICA retains a 41.8% interest in any property remaining after partial condemnation.

108.    The Club has a vested financial interest in preventing condemnation. The Club already provided memberships worth millions of dollars to HRP under the Development Agreement. Once condominiums are constructed, HRP must purchase additional memberships worth nearly $20 million. Each Club member pays annual dues. Condemnation destroys this entire revenue stream.

109.    If the County condemns the Property, the Club loses its $20 million investment and all future membership dues.

110.    The County's threat leaves Fisher Island in doubt about whether to continue investing in the Property's development.

111.    An actual, substantial, and continuing controversy exists concerning: (a) FICA's veto rights under the Option Agreement; (b) the validity of any attempted sale of the FICA Parcel

20

without FICA's consent; (c) the parties' respective rights in the event the County initiates eminent domain proceedings; and (d) whether the County can satisfy the requirements for eminent domain.

112.    A declaratory judgment is necessary and appropriate to resolve this controversy and determine the parties' rights and obligations before the County and HRP complete an unlawful transaction or the County proceeds with an eminent domain taking that violates federal and state law.

## CAUSES OF ACTION

### COUNT I
### UNCONSTITUTIONAL TAKING
### (Florida Constitution, Art. X, § 6(a))

113.    Fisher Island repeats and realleges the allegations contained in paragraphs ¶¶ 1-112 as if fully set forth here.

114.    The County's proposed condemnation of the Property would be unconstitutional under the Florida Constitution and would therefore be improper and invalid.

115.    The County's failure to plan for the lease expiration demonstrates the proposed condemnation is a response to the County's own neglect rather than genuine necessity. The County had years to evaluate alternatives but waited until crisis to claim urgency.

116.    The County's proposed condemnation of the entire property is not for a public purpose because the County needs only part of the Property to operate a fuel facility.  Fisher Island has a direct interest in the County condemning only the necessary portion of the property, if any, because they retain a partial interest in the remaining property upon a partial condemnation.

117.    The County's proposed condemnation of the Property is not for a public purpose because there are alternative sites that the County has not properly considered for the fuel facility,

and the County has time to consider these alternative options.

118.   The County's proposed condemnation of the Property is not for a public purpose because the County has not properly weighed the safety risks of operating the fuel facility on the Property with the costs of choosing an alternative site.

119.   The County's proposed condemnation of the Property is not for a public purpose because the County plans to lease the Property to a private entity to serve as a fuel facility for private cruise lines, which will fuel their ships and sell tickets for a profit.  Upon information and belief, there will be no publicly available fueling facility on the Property, nor will there be any other service generally available to the public.

120.   There is controversy between the parties of sufficient immediacy so as to warrant a declaratory judgment because the County is actively using the threat of an unconstitutional and improper condemnation action as a negotiating tool against HRP, which may result in the initiation of condemnation proceedings regarding Fisher Island's property.

121.   A judicial declaration is therefore necessary and appropriate so that Fisher Island may ascertain the parties' rights and obligations as to the propriety and lawfulness of the County's threatened condemnation action.

### COUNT II
### UNCONSTITUTIONAL TAKING
**(U.S. Constitution, amends. V and XIV**
**42 U.S.C. § 1983)**

122.   Fisher Island repeats and realleges the allegations contained in paragraphs ¶¶ 1-112 as if fully set forth here.

123.   The County's proposed condemnation of the Property would be unconstitutional under the U.S. Constitution.

124.   The County's proposed condemnation of the Property is not reasonably necessary

22

because the County retains a lease on the property that fully serves its purpose of using the Property as a fuel facility.

125. The County's proposed condemnation of the entire property is not reasonably necessary because the County needs only part of the Property to operate a fuel facility. Fisher Island has a direct interest in the County condemning only the necessary portion of the property, if any, because they retain a partial interest in the remaining property upon a partial condemnation.

126. The County's proposed condemnation of the Property is not reasonably necessary because there are alternative sites that the County has not properly considered for the fuel facility, and the County has time to consider these alternative options.

127. The County's proposed condemnation of the Property is not reasonably necessary because the County has not properly weighed the safety risks of operating the fuel facility on the Property with the costs of choosing an alternative site.

128. The County's proposed condemnation of the Property is not for a public purpose because the County plans to lease the Property to a private entity to serve as a fuel facility for private cruise lines, which will fuel their ships and sell tickets for a profit. Upon information and belief, there will be no publicly available fueling facility on the Property, nor will there be any other service generally available to the public.

129. The County has engaged in conduct under color of state law by purporting to exercise the power of eminent domain delegated to it by the State of Florida.

130. The County's action deprives Fisher Island of their right to be free of an unconstitutional taking under the U.S. Constitution.

131. There is controversy between the parties of sufficient immediacy so as to warrant a declaratory judgment because the County is actively using the threat of an unconstitutional and

23

improper condemnation action as a negotiating tool against HRP, which may result in the initiation of condemnation proceedings regarding Fisher Island's property.

132. A judicial declaration is therefore necessary and appropriate so that Fisher Island may ascertain the parties' rights and obligations as to the propriety and lawfulness of the County's threatened condemnation action.

## COUNT III
### SUBSTANTIVE AND PROCEDURAL DUE PROCESS
(Florida Constitution, Art. I, § 9)

133. Fisher Island repeats and realleges the allegations contained in paragraphs ¶¶ 1-112 as if fully set forth here.

134. The County has in effect delegated the decision to condemn Fisher Island's property to a private mediator. Fisher Island is therefore entitled to an opportunity to be heard before the mediator makes that decision. It would be constitutionally inadequate and unfair to deprive Fisher Island of their property without an opportunity to be heard.

135. The County's action deprives Fisher Island of their procedural due process rights under the Florida Constitution.

136. The County's perpetuation of a fuel bunker on Fisher Island without an analysis of the safety concerns with keeping 28.3 million gallons of fuel next to homes and a school with no evacuation routes by road and in a hurricane flood zone is an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation.

137. The County's actions violate Fisher Island's substantive due process rights under the Florida Constitution.

138. There is controversy between the parties of sufficient immediacy so as to warrant a declaratory judgment because the County is actively depriving Fisher Island of its substantive and

24

procedural process rights by effectively ceding its eminent domain authority to a private mediator without involving Plaintiffs and without examining the safety concerns.

139. A judicial declaration is therefore necessary and appropriate so that Fisher Island may ascertain the parties' rights and obligations as to the propriety and lawfulness of the County's resolution approving eminent domain under these circumstances and in effect delegating the decision to initiate eminent domain to a mediator without involving Fisher Island.

140. Fisher Island will be irreparably harmed if the County continues to exclude them from mediation because if mediation fails and the County condemns the Property, Fisher Island will be unable to obtain any relief to compensate them for the loss of their due process rights.

**COUNT IV**
**SUBSTANTIVE AND PROCEDURAL DUE PROCESS**
**(U.S. Constitution, amend. XIV**
**42 U.S.C. § 1983)**

141. Fisher Island repeats and realleges the allegations contained in paragraphs ¶¶ 1-112 as if fully set forth here.

142. The County has violated Fisher Island's substantive and procedural due process rights under the Fourteenth Amendment to the U.S. Constitution.

143. The County has in effect delegated the decision to condemn Fisher Island's property to a private mediator. Fisher Island is therefore entitled to an opportunity to be heard before the mediator makes that decision. It would be constitutionally inadequate and unfair to deprive Fisher Island of their property without an opportunity to be heard.

144. The County's actions deprive Fisher Island of their procedural due process rights under the U.S. Constitution.

145. The County's perpetuation of a fuel bunker on Fisher Island without an analysis of the safety concerns with keeping 28.3 million gallons of fuel next to homes and a school with no

evacuation routes by road and in a hurricane flood zone is an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation.

146.    The County's actions violate Fisher Island's substantive due process rights under the U.S. Constitution.

147.    There is controversy between the parties of sufficient immediacy so as to warrant a declaratory judgment because the County is actively depriving Fisher Island of its substantive and procedural process rights by effectively ceding its eminent domain authority to a private mediator without involving Fisher Island and without examining the safety concerns.

148.    A judicial declaration is therefore necessary and appropriate so that Fisher Island may ascertain the parties' rights and obligations as to the propriety and lawfulness of the County's resolution approving eminent domain under these circumstances and in effect delegating the decision to initiate eminent domain to a mediator without involving Fisher Island.

149.    Plaintiffs will be irreparably harmed if the County continues to exclude them from mediation because if mediation fails and the County condemns the Property, Fisher Island will be unable to obtain any relief to compensate them for the loss of their due process rights.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACT**

150.    Fisher Island repeats and realleges the allegations contained in paragraphs ¶¶ 1-19, 27-47, and 95-112 as if fully set forth here.

151.    Fisher Island is party to the Option Agreement, the Development Agreement, and other contracts and agreements with HRP.  These are valid and enforceable contracts.

152.    The County knew of Fisher Island's contracts with HRP as early as the September 18, 2025 Special Meeting of the Board of County Commissioners.  Indeed, Jimmy Morales, Miami-Dade County's Chief Operating Officer, noted that "[o]ne of the things that purchasers are

26

doing is paying the association $10 million to buy club memberships for the people who are going to live in that condo."  In addition, FICA's Option Agreement was duly recorded on October 10, 2025.

153.    By excluding Fisher Island from mediation that will decide the disposition of Fisher Island's property—and using the threat of an unlawful and improper eminent domain action in the process—the County has intentionally and unjustifiably interfered with Fisher Island's contracts with HRP.

154.    In addition, the County's approach—threatening condemnation while excluding Fisher Island from mediation—has created prolonged uncertainty over the Property's future. That uncertainty has consequences.  Upon information and belief, HRP's lender holds a security interest in property now subject to an indefinite eminent domain threat. Lenders faced with such uncertainty may compel borrowers to settle—or foreclose to protect their collateral.  The effect is to place Fisher Island's contractual rights at risk through collateral financial pressure rather than constitutional process.

155.    The County's interference has damaged Fisher Island by excluding them from mediation, which silences their ability to fight back against the County's eminent domain and may result in the loss of Fisher Island's property without their input.

156.    The County's interference further puts Fisher Island in the position of having to choose between the precarious option of investing in the development of a Property that may end up in the County's hands and delaying their contractual rights.

157.    Fisher Island will be irreparably harmed without an order enjoining the County

from further interfering with Fisher Island's contracts by excluding them from mediation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

a.   A declaratory judgment that:

    i.   The County's proposed condemnation of the Property would violate the U.S. Constitution;

    ii.   The County's proposed condemnation of the Property would violate the Florida Constitution;

    iii.   The County is depriving Plaintiffs of their federal due process rights by excluding them from mediation; and

    iv.   The County is depriving Plaintiffs of their state due process rights by excluding them from mediation;

b.   An order enjoining the County from continuing to engage in mediation without giving Plaintiffs an opportunity to be heard;

c.   An order enjoining the County from continuing to tortiously interfere in Plaintiffs' business relationships and contracts;

d.   Attorneys' fees and costs.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of any issues so triable.

28

Dated: January 21, 2026

Respectfully submitted,

/s/   *Jason D. Sternberg*

Jason D. Sternberg
Florida Bar No. 72887
jasonsternberg@quinnemanuel.com
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
Tel.: (305) 402-4880
Fax: (305) 901-2975

Christopher G. Michel (*pro hac vice*
forthcoming)
christophermichel@quinnemanuel.com
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
555 13th Street NW, Suite 600
Washington, D.C. 20004
Tel: (202) 538-8000
Fax: (202) 538-8100

*Counsel for Plaintiffs*

29